Thomas E. PROCTOR, 2nd, John Riker Proctor, Esther B. Proctor, Mary P. Case, Emma M. Rice, Geraldine M. Craig, Neil W. Rice, Hilda R. Ayer, Thomas E. P. Rice; and Thomas M. Reynolds, David Broude and Boston Safe Deposit and Trust Company, Trustees under the Last Will and Testament of Thomas E. Proctor, Deceased, Plaintiffs,

v.

SAGAMORE BIG GAME CLUB, The Sylvania Corporation, United Natural Gas Company, National Fuel Gas Company, Frank G. Altman, H. P. Boarts, F. E. Carrol, W. L. Carroll, A. J. Eisenhuth, H. U. Flickinger, John W. Flickinger, Bertha E. Jones Shearer, John Rummel, A. C. Thomas, William Walker, D. D. Flickinger, Antonia Johnson, Clyde K. Moore, George C. Schrecongost, R. L. Seger, L. E. Thomas and E. C. Warehan, Defendants.

Civ. A. No. 432.

United States District Court
W. D. Pennsylvania.
June 19, 1958.

John C. Youngman, Williamsport, Pa., Herbert R. Carroll, Pittsburgh, Pa., John Cartwright, Ridgway, Pa., Evans, Ivory & Evans, Pittsburgh, Pa., for plaintiffs.

Frampton & Courtney, Oil City, Pa., H. P. Boarts, Kittanning, Pa., Gifford,

Graham, MacDonald & Illig, Erie, Pa., for defendants.

WILLSON, District Judge.

Plaintiffs claim to be the owners of the natural gas in and on 1100 acres of land, being Warrant 5343, situate in Benezette Township, Elk County, Pennsylvania, in this judicial district. In this civil action they seek to recover damages from the defendants for the wrongful taking and removal of the natural gas and for the recovery of the possession of the mineral estate in the land, and to restrain the defendants from further trespassing upon the minerals, particularly the natural gas.

At an earlier stage in this lawsuit, defendants filed motions to dismiss, raising questions of jurisdiction and venue. See D.C., 128 F.Supp. 885. Each of the parties has now filed motions for summary judgment under Rule 56, Fed. Rules Civ.Proc. 28 U.S.C.A. Defendants' motion was filed on October 11, 1957 and plaintiffs' motion was filed October 21, 1957. Oral argument has recently been held and briefs have been filed. Defendants' motion will be granted.

Since the inception of the suit, defendants have maintained that the records in the various county offices of Elk County show an unbroken chain of title from the common source of title to and in them. In prior proceedings, defendants sought an order of this court requiring plaintiffs to file an abstract of their title as is done in state ejectment practice (Rule 1054, Pennsylvania Rules of Civil Procedure, 12 P.S.Appendix). On this point, however, my ruling was as indicated in 128 F.Supp. 885, that the same result could be achieved under Rule 36, by the filing of requests for admissions on the part of both parties. Thereafter extensive requests for admissions were filed by each side and the parties were heard on their several objections to the opposing party's requests. The result has been that by the discovery process, that is, the requests for admissions and the hearings thereon, the records of Elk County are admitted for all purposes in this civil action. The defendants rely upon the title shown of record in the various Elk County offices. Plaintiffs concede the matters shown by the records in Elk County, but sharply dispute the construction and interpretation placed upon them by the defendants. The fact that the property has been drilled and that millions of dollars worth of gas has been removed from the land is admitted. On the part of plaintiffs it should be stated also that the admissions show the present plaintiffs to be the successors to the title to the gas, if any, acquired by Thomas E. Proctor, Sr.

For convenience here, I have attached two Appendices to this opinion. Appendix A is the assessment record of this unseated land taken from the records of Elk County, commencing in the year 1870 and continuing uninterruptedly through the year 1954. The complaint was filed in September 22, 1954. The assessment record is not in dispute whatsoever and appears as part of the admissions.

Appendix B is made up of the chain of title appearing of record in the county offices of Elk County, relating to the title to Warrant 5343 for the period which is involved in this litigation. The parties agree that the matters shown in Appendix B appear of record in Elk County.

Jurisdiction depends upon diversity of citizenship. Plaintiffs seek to enforce rights under the laws of Pennsylvania only, the land being situate in Pennsylvania. The land was drilled by the gas companies and the gas removed and sold in Pennsylvania. The doctrine, of course, is that as the subject matter is not governed by the Federal Constitution or by Acts of Congress, the applicable law in this action is the law of Pennsylvania. See Guaranty Trust Company of N. Y. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079. Rule 81 (e) of the Federal Rules of Civil Procedure provides:

"When the law of a state is referred to, the word 'law' includes the statutes of that state and the state judicial decisions construing them."

■ The claim for relief in this case involves title to real property. Under the older Pennsylvania state practice, at least, the action would be one of ejectment accompanied by a claim for mesne profits because defendants do not deny that they have drilled and removed 10,-881,625 MCF of gas from the property. The point is that both under Federal and state practice, in a situation where the record title is undisputed, the question is one of law. The Court of Appeals of this circuit in Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016, at page 1018, says:

"It is now well settled that summary judgment may be entered for either party if the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Civil Procedure Rule 56. Stated conversely, a substantial dispute as to a material fact forecloses summary judgment."

A decision of the Supreme Court of Pennsylvania is to the same effect: First Pool Gas Coal Co. v. Wheeler Run Coal Co., 301 Pa. 485, 152 A. 685, where the headnote says:

"When the controlling question raised by the pleadings, in an action of ejectment, is one of law, the court may enter judgment thereon in favor of the party legally entitled thereto, under the Acts of June 7, 1915, P.L. 887, and June 12, 1919, P.L. 478 (12 P.S. § 1548)."

And, on page 487 of 301 Pa., on page 686 of 152 A., the court says:

"We have often held that when the controlling question raised by the pleadings in an action of ejectment is one of law, the trial court may enter judgment thereon in favor of the party legally entitled

thereto. See Porter v. Hayes, 293 Pa. 194, 142 A. 282; Schoch v. American International Corp., 286 Pa. 181, 133 A. 155; Gailey v. Wilkinsburg Real Estate & Trust Co., 283 Pa. 381, 129 A. 445; Levy v. Seadler, 272 Pa. 366, 116 A. 294; Shaw v. Cornman, 271 Pa. 260, 114 A. 632; Glenn v. Stewart, 265 Pa. 208, 108 A. 599. This is a wise provision of the statute, for where the pleadings clearly show the case turns on a question of law it is vain to invoke the aid of a jury."

Both parties agree that the title to the warrant of land is out of the Commonwealth of Pennsylvania and that the common source of title is that in Bigler, Powell and Cardon, Excerpt No. 1. The parties also agree that the title of Thomas E. Proctor, Sr. was from Bigler, et al. by the deed of June 5, 1893, Excerpt No. 2.

The assessment record shows, for the year 1892, the unseated land, Warrant 5343, in Benezette Township, in the name of Cook and Pardee, previous owners. At the time Thomas E. Proctor, Sr. got his title, Excerpt No. 2, the 1892 taxes were due and unpaid and were a lien on the land comprising the warrant. Excerpts Nos. 3, 4, 5, 6, 8 and 9 show the following:

On June 11, 1894, Warrant 5343, assessed on the unseated list in the name of Cook and Pardee, was sold by the Treasurer of Elk County, Pennsylvania, to George W. Childs for $113.70, which was the amount of the arrearages of said taxes for the year 1892, plus costs.

The price of $113.70 bid for said Warrant 5343 at the tax sale held June 11, 1894, was paid by said George W. Childs to the Treasurer of Elk County, Pennsylvania.

The Treasurer of Elk County, Pennsylvania, on July 3, 1894, acknowledged his deed for said Warrant 5343 to George W. Childs in open court of Common Pleas for Elk County, Pennsylvania, of which the record appears in the Prothonotary's Office for said County in

Treasurer's Acknowledgment Book B, pages 216 and 217.

The Treasurer of Elk County, Pennsylvania, delivered his deed for said Warrant to George W. Childs, which is recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book W, page 468.

There was no redemption of said Warrant 5343 from said tax sale of June 11, 1894.

George W. Childs and wife on June 28, 1898, assigned all their right, title and interest in said Treasurer's deed for Warrant 5343, containing 1100 acres, to Elk Tanning Company, which is recorded in Elk County Deed Book 2 at page 480.

On May 25, 1903, Elk Tanning Company conveyed to Central Pennsylvania Lumber Company several tracts of land, inter alia, Warrant 5343, containing 1100 acres situate in Benezette Township, which is recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book 55, page 381.

Excerpts 10 through 19 show the following:

On June 8, 1914, Warrant 5343 was sold by the Treasurer of Elk County, Pennsylvania, for arrearages of taxes for the years 1912 and 1913 assessed on the unseated list in the name of Central Pennsylvania Lumber Company, to C. H. McCauley, Jr., for taxes and costs of $171.60.

The Treasurer of Elk County, Pennsylvania, on July 6, 1914, acknowledged his deed for said Warrant to C. H. McCauley, Jr., in open court of Common Pleas for Elk County, Pennsylvania, of which the record appears in the Prothonotary's Office for said County in Treasurer's Acknowledgment Book B, pages 290 and 291.

The deed from the Treasurer of Elk County, Pennsylvania, to C. H. McCauley, Jr., for said Warrant 5343, is recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book 138, page 99.

There was no redemption of said Warrant 5343 from said tax sale of June 8, 1914.

By deed dated December 6, 1920, recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book 80, page 451, Central Pennsylvania Lumber Company conveyed said Warrant 5343 containing 1100 acres to Andrew Jackson Eisenhuth. Said deed contained no exceptions or reservations.

By deed dated February 1, 1921, Calvin H. McCauley, Jr., and wife quitclaimed all right, title and interest acquired by said Treasurer's deed dated June 8, 1914, to Andrew Jackson Eisenhuth and Minnie Eisenhuth, his wife, which is recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book 85, page 518.

By deed dated June 8, 1921, Andrew Jackson Eisenhuth and wife conveyed said Warrant 5343 to The Sagamore Big Game Club, which is recorded in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Deed Book 81, page 217.

On August 31, 1933, The Sagamore Big Game Club leased 1100 acres comprising said Warrant 5343, for oil and gas purposes to R. W. Howard and Belle I. Howard, which is recorded on September 22, 1933, in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Miscellaneous Book M, page 91.

On May 31, 1940, The Sagamore Big Game Club leased for oil and gas purposes to The Sylvania Corporation a tract of land in Benezette Township, bounded and described as follows: North by lands of Warrant 5342, East by lands of Warrant 5388, South by lands of Warrant 5344, and West by lands of Warrant 5340, recorded on June 7, 1940, in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Miscellaneous Book M, page 396.

On May 31, 1950, The Sagamore Big Game Club leased for oil and gas purposes to The Sylvania Corporation a tract of land in Benezette Township bounded and described as follows:

North by lands of Warrant 5343; East by lands of Warrant 5388; South by lands of Warrant 5344; and West by lands of Warrant 5340, recorded on August 12, 1950, in the Office of the Recorder of Deeds for Elk County, Pennsylvania, in Miscellaneous Book O, page 40.

The Sylvania Corporation, in pursuance of said lease of Warrant 5343 from The Sagamore Big Game Club, entered on the lands comprising said Warrant, and between April 1, 1953, and June 26, 1954, completed eight producing gas wells thereon.

Plaintiffs challenge defendants' record title on three main grounds:

1. The alleged tax sale of June 11, 1894, was void for want of a duly acknowledged deed.

2. The alleged tax sale to George W. Childs on June 11, 1894, was made under such attendant circumstances as to render inequitable or constructively or actually fraudulent any claim that Thomas E. Proctor was thereby divested of his title to Warrant 5343.

3. The defendants are estopped to assert any claim to the natural gas under Warrant 5343 by the deed of May 25, 1903, from Elk Tanning Company to Central Pennsylvania Lumber Company, through which they claim title.

As to plaintiffs' first contention, it is to be noticed that the Proctor title comes from the exceptions and reservations in the deed to Elk Tanning Company dated October 1, 1894, Excerpt No. 7. This deed conveyed eighteen tracts of land, including Warrant 5343. Proctor excepted and reserved to his heirs and assigns all the natural gas, coal, coal oil, petroleum, etc. on all of the tracts conveyed. Defendants contend, however, that Proctor had no title to except and reserve at the time of the execution of the deed to the Elk Tanning Company. The Pennsylvania cases support defendants on this point. In Taylor v. Taylor, 228 Pa. 424, 77 A. 663, 664, the Supreme Court of Pennsylvania held as follows:

" * * * These cases hold that the purchaser of land at a treasurer's tax sale has an inchoate title the moment the property is knocked down to him, which becomes perfect with payment of the purchase money. His rights are fixed by the sale, and the subsequent payment of the purchase money and the delivery of the deed relate back to it. These cases announced no new rule in this respect but followed the authority of earlier cases. It is sound, and we see no reason to disturb it."

The cases referred to by the court in the quotation above are earlier decisions: Kunes v. McCloskey, 115 Pa. 461, 9 A. 83, and McCloskey v. Kunes, 142 Pa. 241, 21 A. 823. Also see Caul v. Spring, 2 Watts 390, at page 396, where the court says:

"A sale of unseated land for taxes vests the title when regularly made in the vendee to the exclusion of all other claimants to the land of a prior date."

The public record in Elk County is clear that the treasurer's sale of June 11, 1894 was followed by a treasurer's deed duly acknowledged in open court. The result was that the tax sale of June 11, 1894 extinguished Proctor's title acquired in the deed from Bigler, et al. on June 5, 1893, and cut off the exception and reservation of the gas mentioned in his deed of October 1, 1894 to Elk Tanning Company. The public record thus defeats any claim for relief asserted by the plaintiffs in this case.

Plaintiffs, however, contend that the treasurer's deed was not acknowledged as required by state law and therefore the tax sale of June 11, 1894 is void and the exception and reservation of the natural gas made by Proctor is still good against all of the defendants. Incidently, this is the crux of plaintiffs' motion for summary judgment, which will be refused because the court is of the opinion that the acknowledgment was substantially in accordance with

the requirements of the statute. The point under discussion goes way back in the Pennsylvania state statutes. By the Act of April 3, 1804, 4 Sm.L. 201, it was provided:

"All unseated lands within this Commonwealth * * * shall * * be valued and assessed as other property but collection of taxes on unseated lands shall not be enforced by sale of such lands * * * until the county commissioners shall issue their warrant * * * directed to the sheriff of the proper county commanding him after having given * * * notice * * * in newspaper * * * stating that the sale of unseated lands for arrearages of taxes will commence on a certain day, to make public sale * * * of unseated lands as * * * necessary for the payment of the taxes due thereon * * * and to make and execute a deed or deeds in fee simple to the purchaser or purchasers of any unseated lands so sold and the same in open court of Common Pleas of the proper county duly to acknowledge * * *."

Subsequently, the Act of March 13, 1815, 6 Sm.L. 299 directed that the sale of unseated lands for arrearages of taxes be made by the treasurers of the several counties and that they make and execute a deed or deeds in fee simple in the manner directed by the Act (April 3, 1804) "to which this is a further supplement," etc. 72 P.S. § 5981.

It will be noted that there is *no statutory provision* as to the *manner or method* of how the acknowledgment of deeds by the County Treasurer in open court is to be entered among the records kept of the court proceedings.

Counsel for the parties point to practically the same decisions of the appellate courts of Pennsylvania to sustain their respective points of view as to whether the treasurer's deed was validly acknowledged in open court as required by the statute. The principal cases are: Lee v. Newland, 1894, 164 Pa. 360, 30 A. 258; Osmer v. Sheasley, 1908, 219

Pa. 390, 68 A. 965; Central Pennsylvania Lumber Co. v. Bristol, 1915, 250 Pa. 61, 95 A. 383; Grakelow v. Nash, 1930, 98 Pa.Super. 316; Carns v. Matthews, 1932, 106 Pa.Super. 582, 162 A. 501; Gregory v. Davis, 1935, 117 Pa. Super. 1, 177 A. 331.

On this issue, plaintiffs take very narrow ground. They say that the minutes of the court must show the acknowledgment. Plaintiffs say the first decision on the subject was Lee v. Newland. They indicate that this case holds that the minutes must show acknowledgment of the treasurer's deed. However, I do not find in the decision the holding that plaintiffs claim is there. In the cited case, plaintiffs claimed under a treasurer's deed to one Oscar Fox, bearing date 24th day of January, 1859. Attached to the deed was a certificate of acknowledgment by the Prothonotary of Forest County. The treasurer's sales books of unseated land for the year 1858 were offered in evidence. In the decision, 164 Pa. at pagt 361, 30 A. 258, the court charged:

" 'The minute book No. 1, a docket in which is kept a record of acknowledgments of treasurer's deeds, was given in evidence.' "

This book showed that the deed in question was acknowledged Tuesday, the 28th of September, 1858, by Charles J. Fox, Treasurer. The court held that the record must be correct and that it could not be contradicted or supplemented by parol. The deed which the record showed was acknowledged September 28, 1858 could not possibly have been the deed dated January 24, 1859, as the acknowledgment came several months ahead of the date of the deed.

In Osmer v. Sheasley, the second case cited by plaintiffs, the court said, at page 397 of 219 Pa., at page 967 of 68 A.:

"In the case in hand the facts in regard to the execution, acknowledgment, and delivery of the deed are not in dispute. The records of the common pleas, the only evidence admissible to show the acknowledg-

ment of a treasurer's deed, disclose no acknowledgment of the deed to Engelskirger until 11 years after the date of its execution, and some months after the execution and delivery of the deed by the assignee in bankruptcy conveying the land in dispute to the plaintiff."

And further, at page 398 of 219 Pa., at page 968 of 68 A., in speaking of Lee v. Newland, the court quoted from the decision as follows:

"* * * 'It is the duty of the purchaser to see that his deed is so acknowledged and registered (in the common pleas), and of every purchaser of a tax title to examine the record of acknowledgments for himself.' "

I do not view Lee v. Newland and Osmer v. Sheasley as holding that a Common Pleas court record showing an acknowledgment must be out of a book styled "Minutes of the Court." It is noticed again that in Lee v. Newland the statement of the court was that "* * * The minute book No. 1, *a docket* in which is kept a record of acknowledgments of treasurer's deeds was given in evidence." (Emphasis supplied) And in the Osmer case, the court referred to the records in the Common Pleas.

Both sides cite Central Pennsylvania Lumber Co. v. Bristol. In that case on the same subject the court said:

"The short minute kept in one book and the complete record in another by the same official, and in the same office, may very properly be deemed in pari materia as minutes relating to the same subject-matter; and, when so construed, the record here presented complies with what the law requires as to the keeping of a record of the acknowledgment."

Both the preceding decisions are cited. In the Central Pennsylvania Lumber Co. case, there was a separate book marked "Treasurer's Deeds," kept by the Prothonotary. The general minutes of the term included the statement that the treasurer of Potter County came into open court and acknowledged 124 deeds before the full bench. The specific tracts sold were not mentioned in the minutes but the tract in question was shown in the book marked "Treasurer's Deeds." The court held that there was a compliance with the acknowledgment act.

In Carns v. Matthews, the opinion is by Judge Stadtfeld of the Superior Court of Pennsylvania. He discusses the Act of May 11, 1911, P.L. 257 (21 P.S. § 48), which is the Act stating that the certificate of the prothonotary endorsed thereon, under the seal of the court [106 Pa.Super. 582, 162 A. 502], "* * * shall be prima facie evidence of the fact of such acknowledgment: * * *" etc. It is noticed that the Act says that "* * * such prima facie evidence may be rebutted by showing that such deed was not acknowledged, when the records of the court do not contain any entry of the acknowledgment of such deed. * * *" Plaintiff offered in evidence the minutes of the court which read: "Oct. 8, 1928, 187 treasurer's deeds presented in open court." The court said:

"* * * The plaintiff, in offering in evidence the above minutes of the prothonotary for the purpose of showing that there was no such acknowledgment of the treasurer's deed in open court, evidently overlooked the fact that the real record of the treasurer's deed and acknowledgments of the same are contained in the treasurer's deed book vol. 1 of the prothonotary's office."

The court held that the treasurer's deed book might have been offered in evidence to complete the record of the acknowledgment as indicated in the minutes.

The Carns v. Matthews case was decided after Grakelow v. Nash, in which Judge Linn fully discusses the point at issue here. He says, at page 322, of 98 Pa.Super., in speaking of a judicial record:

"* * * A judicial record was thus described by Judge Lowrie in

Wilkins v. Anderson, 1 Phila. 134, 136: 'We treat all the authorized written minutes, made in the course of the case, as part of the record, whether made in the minute book, appearance docket, continuance docket, trial list, argument list, or placed among the files. We have no such thing as a continuous record of the whole proceedings made up in one roll (as in England), or even in a book or set of books. The most important part of the record often consists of loose papers in the files of the office. The original entry of each matter in the course of a suit, is essentially the record of that matter; for by it all subsequent entries and writs are corrected.' " [Citing cases]

He also said:

"We then consider it established that for important purposes there must be some record by the court of its judicial act in taking the treasurer's acknowledgment of his deed. That requirement is not rendered unnecessary by the Act of 1911. At this point we may again refer to the only evidence of any record of the court below of the acknowledgment of treasurer's deeds. The finding is that the record of the alleged tax-sale states that 'Under date of August 1st, 1925, appears the following minute: "The county treasurer presented ——— deeds for property sold at treasurer's sale for unpaid taxes in June, 1924, and acknowledged the same in open court according to law." ' Concerning that minute, the trial judge very properly said that 'There is nothing from which the deed in the present case can be identified as one of those acknowledged by the treasurer on August 1, 1925. The minute does not even declare that deeds for all of the lots sold at the treasurer's sale in June, 1924, were acknowledged. Nor is there *any other record* kept by the prothonotary from which the inference could be drawn that the deed of the defendant was one of those acknowledged August 1st, 1925 * * *. We are, therefore, of the opinion that the above minute, *standing alone*, is not sufficient to prove that the defendant's deed was acknowledged in open court.' We must go further and hold that the record proves that the deed under which defendant claims was not acknowledged in open court August 1, 1925." (Emphasis supplied)

A later case than any of the others cited is Gregory v. Davis, 1935. In speaking of this same subject, the court said [117 Pa.Super. 1, 177 A. 332]:

"* * * The Legislature, by the Act of May 11, 1911, P.L. 257 (21 P.S. § 48), has lightened a bit the burden on one claiming under a tax title, as the deed bearing the prothonotary's certificate of acknowledgment is now prima facie evidence of that fact. But as to all other requirements, it is still true as stated in Osmer v. Sheasley, 219 Pa. 390, 394, 68 A. 965, 966: 'He who claims real estate by virtue of a tax title must be able to point to a substantial compliance with all the essential requisites provided in the statute.' See, also, Grakelow v. Nash, 98 Pa.Super. 316; Carns v. Matthews, 106 Pa.Super. 582, 162 A. 501. An entry of a return to the first term and a nisi confirmation were fundamental requisites to the validity of the sale, and, unless performed, the purchaser's title and right of possession are not completed. Until the return is entered upon the *books of the prothonotary*, there is no court record of the sale. Prior to the nisi confirmation there is no judicial action, and without an absolute confirmation there is no judicial approval of the sale as the law contemplates." (Emphasis supplied)

It seems to this court that a fair interpretation of the quotation from the cited decision is that the record of the

fact is that which appears in the books of the prothonotary, who is the custodian of all the court records in the Pennsylvania judicial system.

The foregoing decisions point out the rule to be followed in the instant case. The public records of the prothonotary of Elk County show that there is one book kept by the Prothonotary called "Trial List and Court Minute." This book shows that a session of Common Pleas Court of Elk County was held on July 3, 1894. It shows the docket entries of cases which apparently came up at the May term, 1894. The entry for July 3, 1894, shows that the president and associate judges were on the bench and that certain officers were in attendance, including the prothonotary and members of the bar. The Trial List and Court Minute book does not show that the treasurer appeared in court on that day. However, it is conceded that there is also a book in the prothonotary's office entitled "Treasurer's Acknowledgment Book B." Photostats of pages 216 and 217 of this book have been offered and there is no dispute as to what appears therein. Across the top of both pages there is written in longhand, "Elk County ss. Be it remembered that at a Court of Common Pleas held at Ridgway in and for said County of Elk on the 3rd day of July 1894 personally appeared T. J. Shaffer Esq. Treasurer of the County of Elk, and in due form of law acknowledged the following Deed Pools (sic) to the persons therein named to be his act and deed for the purposes therein named, and desired the same might be recorded as such according to law. Acknowledgment of Treasurers Sales for the taxes of 1892 and 1893 (Sales year 1894) by T. J. Shaffer Treasurer of Elk Co." Below the handwriting two lines are drawn across both pages, below which ten columns appear. The columns are headed: One, Warrant; Two, No. of Acres; Three, Warrantee &c; Four, Supposed Owner; Five, Township; Six, Purchaser; Seven, Date of Sale; Eight, Tax & Costs; Nine, Bond; Ten, Bid. Below the column

headings appear the various tracts of land sold. Item 8 is Warrant 5343, 1100 acres, assessed to Cook and Pardee and sold to George W. Childs, June 11, 1894 for $113.70, being the amount of tax and costs and the amount bid.

As this court understands it, plaintiffs' main contention in this case is that what is shown on the treasurer's acknowledgment book B is not a part of the minutes of the court and thus the treasurer's acknowledgment of the June 11, 1894 deed is invalid. My conclusion, however, is to the contrary. Again referring to Grakelow v. Nash, Judge Linn very carefully reviewed the requirements as to a judicial record. He quoted the early case of Wilkins v. Anderson, 1 Phila. 134:

" * * * As a matter of logic and of fact, the prothonotary of the Common Pleas courts of Pennsylvania keeps the minutes as well as the dockets and other court records."

Counsel have not pointed to any statute, nor has this court been able to find a statute which precisely defines minutes. The requirement is that a court of record must keep memoranda of its actions. In Dougherty v. Commonwealth, 1872, 69 Pa. 286, the statement is made that each court is bound by law to keep a record of its own proceedings, but in speaking of a capital case and the requirement that the prisoner must be present at the trial, verdict and passing of the sentence, the court said: " * * * What then are the facts as shown by the records?" The court speaks of the docket entries made by the clerk of the Court of Quarter Sessions and of the Court of Oyer and Terminer as being the record.

And also, on this same subject again, in Grakelow v. Nash, Judge Linn says, at page 323 of 98 Pa.Super.:

"We then consider it established that for important purposes there must be *some record* by the court of its judicial act in taking the treasurer's acknowledgment of his deed."

In the instant case it has been demonstrated that there is a record, precise and complete in itself, showing that the treasurer of Elk County came into court on July 3, 1894, and that he acknowledged the particular deed in question as required by the statute. The court being in session that day, the record as a whole is complete and in compliance with the statute. The result is that there is no genuine issue as to any material fact pertaining to the acknowledgment of the treasurer's deed. This issue was decided in favor of the defendants.

Defendants' second and third contentions can be considered together. Plaintiffs claim that the public records show, and The Sagamore Big Game Club was therefore, in 1921 put upon notice, that certain relationships existed between George W. Childs, Proctor and the Elk Tanning Company, which preclude the defendants from claiming title under the tax sale of June 11, 1894. Plaintiffs contend that other public records in Elk County in the chain of title to the property in question show that Childs was the president of Elk Tanning Company, and also that Thomas E. Proctor, Childs and possibly others were concerned in what plaintiffs call the leather trust, of which more will be said. Plaintiffs invoke the general principle that one who has a duty to pay taxes on a parcel of land cannot acquire the property in a tax sale in derogation or in violation of his duty to other persons to pay the taxes. In their opposition to defendants' motion for summary judgment, plaintiffs also assert that they should be permitted at trial to show certain of these matters to avoid the effect of the tax sale of June 11, 1894.

█ As to the plaintiffs' contentions, it is appropriate to notice Pennsylvania law relative to the obligation to pay taxes on unseated land. This court agrees with defendants that in Pennsylvania there has existed for generations a well-defined system effecting tax sales of unseated land. A very respectable authority entitled "Tax Sale and Titles and The Evidence of the Same in Pennsylvania," a text book by John F. Whitworth written in 1900, the difference between seated and unseated lands and the effect of their sale for unpaid taxes is mentioned in Chapter IV, page 52:

> "§ 29. — Distinction
>
> "There is, to some extent, a difference in the law as applicable to seated and unseated property. Mr. Justice Gordon clearly states the distinction between the two classes of property in these words: 'It follows that the question whether a tract of land is seated or unseated, depends altogether upon what has been done, or is being done, upon it; upon the appearance which it may present to the eye of the assessor. It is his business to return the land as seated if he finds upon it such permanent improvements as indicate a personal responsibility for its taxes. On the other hand, if there be no such improvements, he must return it as unseated. *Unseated lands are alone liable for taxes as assessed thereon.* There is no personal liability on the owner for their payment. The owner of seated land is personally responsible for the payment of the taxes assessed on such lands; and since the act of twenty-ninth of April, 1844, the land also is bound, and may be sold in payment of the same, when returned by the collector." (Emphasis supplied)

The author cites in support of the statement in the text, several of the early Pennsylvania decisions, Stoetzel v. Jackson, 105 Pa. 562, Neill v. Lacy, 110 Pa. 294, 1 A. 325, and Hathaway v. Elsbree, 54 Pa. 498.

█ Thus the decisions are many and uniform that there is no personal obligation whatsoever on the part of any individual owner to pay taxes on land assessed as unseated. When there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals. Powell v. Lantzy, 173

Pa. 543, 34 A. 450. That decision holds that the owner of the mineral rights holding by virtue of a reservation in a deed is neither a tenant in common nor a joint tenant with the owner of the surface. Each has a separate estate, and each is separately the subject of taxation. See F. H. Rockwell & Co. v. Warren County, 228 Pa. 430, 77 A. 665. By the statute and the decisions of the appellate courts of Pennsylvania, at a tax sale of unseated land followed by duly acknowledged treasurer's deed, a fee simple title is conveyed to the purchaser. When Proctor failed to redeem from the June 11, 1894 tax sale within the statutory period, his exception and reservation of the gas was forever cut off.

On this point, however, plaintiffs contend that the following admissions by defendants as to the relationship of the purchaser, George W. Childs, with the Elk Tanning Company and Proctor nullifies the tax sale. The admissions are:

1. George W. Childs was president of Elk Tanning Company from the date of its incorporation, May 8, 1893, continuously through June 8, 1903.

2. George W. Childs, who was the named purchaser of Warrant No. 5343 at the alleged tax sale thereof on June 11, 1894, and the George W. Childs mentioned in No. 1 above were the same person.

Plaintiffs further contend in connection with the foregoing admission that the deed from the Elk Tanning Company to the Central Pennsylvania Lumber Company of May 23, 1903, Excerpt No. 9, specifically recognizes the Proctor exception and reservation made in the deed of October 1, 1894. The result of the transaction of 1903, according to plaintiffs, is that if the exception and reservation of the gas was lost at a tax sale, it was reinstated by the deed, because of Childs' relationship with Elk Tanning Company. Plaintiffs say that he must be held to have acted for that corporation, and that it recognized the reservation in the deed to the Central Pennsylvania Lumber Company.

Plaintiffs also contend that the deed of May 25, 1903, to the Central Pennsylvania Lumber Company, estops defendants from asserting any claim to the natural gas under the warrant because, inter alia, by the deed " * * * the directors sell and convey * * * the land hereinafter described * * * subject to the reservations and exceptions hereinafter stated * * *." The habendum clause in the deed says, " * * * subject to the exceptions and reservations hereinbefore mentioned * * *," but the deed itself makes no reservation of oil and gas, nor does it refer specifically to the Proctor reservation.

The question might well be posed, what effect do plaintiffs' contentions just recited have upon The Sagamore Big Game Club and the individual owners thereof, who are the defendants in the case along with the two gas companies, The Sylvania Corporation and United Natural Gas Company. Defendants admittedly are strangers to the title. As shown in Appendix B, the chain of title to the warrant comes down in regular order with The Sagamore Big Game Club acquiring the fee title on June 8, 1921, Excerpt No. 16. The first oil and gas lease was made by The Sagamore Big Game Club on August 31, 1933, Excerpt No. 17. Again the property was leased by Sagamore to Sylvania on May 31, 1940, for oil and gas purposes. The final lease under which the gas companies now hold was made May 31, 1950. Plaintiffs do not contend that the defendants had knowledge of any agreements between Childs, Elk Tanning Company, Proctor or any persons comprising the so-called leather trust. Bearing in mind that the gas is on unseated land and the obligation to pay taxes is as mentioned in Powell v. Lantzy, 173 Pa. at page 550, 34 A. at page 452:

"Any moral obligation to agree and jointly pay the tax, each contributing his just share, rested equally upon the owners of the different parts; but there was no legal duty on either to do this. It was their separate, not their joint, in-

terests which were in peril. They were not interested for or with each other, and no relation of confidence existed between them which gave rise to a duty which equity will enforce through the medium of a trust."

Under plaintiff's theory as to its right of recovery, it must be held that in 1921, when The Sagamore Big Game Club purchased the property it was bound to examine matters dehors the title record in Elk County to determine whether the tax sale of June 11, 1894 was valid. It is believed that under Pennsylvania law, there is no such requirement.

As the court understands plaintiffs' offer of proof, it proposes to show certain transactions by Proctor and some of his associates in Pennsylvania and elsewhere in the promotion and organization of the U. S. Leather Company, known at the time as the Leather Trust, and its various ramifications in the form of subsidiaries and affiliates in the fields of tanning, gathering hemlock bark, sawmill operations, all interrelated, disclosing the efforts of Proctor to control, to as large an extent as possible, the production of leather and of such related enterprises as have been referred to; and on the basis of such transactions, to set aside the tax sale because:

"The alleged tax sale to George W. Childs on June 11, 1894, was made under such attendant circumstances as to render inequitable or constructively or actually fraudulent any claim that Thomas E. Proctor was thereby divested of this title to Warrant 5343."

Defendants say that essentially the story is as follows: In the 1890's, Thomas E. Proctor sought to obtain control of the tanning industry in Pennsylvania and elsewhere, or a major part of it, by the organization of the U. S. Leather Company, a New Jersey corporation, of which he himself became president. He and others owned tanneries and lands producing tan bark. The tanneries and lands from which tan bark was obtainable were conveyed to Pennsylvania corporations, which they organized, among them being the Elk Tanning Company at Ridgway, the Union Tanning Company at Williamsport, and the Penn Tanning Company at Sheffield, which became subsidiaries of the U. S. Leather Company and affiliates of each other.

The Elk Tanning Company was interested in Warrant 5343 in order to strip the timber of tan bark. The Central Pennsylvania Lumber Company, an affiliate of Elk Tanning Company was interested in the saw timber. And after they got through with that operation, the Warrant was conveyed to Eisenhuth by the purchaser at tax sale for default of taxes for the years 1912 and 1913, and also by conveyance to Eisenhuth by the Central Pennsylvania Lumber Company; and the title passed from him and his wife to The Sagamore Big Game Club.

It appears that George W. Childs, the purchaser of Proctor's interest in Warrant 5343 when it was sold for the unpaid taxes of 1892, was president of Elk Tanning Company. It appears also that as a part of the plan of Proctor and his associates in the conveyances of these various properties that they owned to the tanning companies mentioned, they proposed to retain the mineral and gas rights.

Plaintiffs assert that they can prove the foregoing by documents, some of which have admittedly been in the vaults of the New England Trust Company for half a century, but none of which appears of record in Elk County, except perhaps that Childs was president of the Elk Tanning Company. That appears by the fact that he signed the deeds as president of the corporation. In answer to plaintiffs' contention in this respect, defendants say that the history recited as to Proctor's activities has no relevancy to the issues in the case. Defendants say there is not the slightest reference to any of the facts and circumstances in the title records of Elk County, nor could a title examiner be put on notice of them in

478

passing upon Warrant 5343. Assume for purposes of discussion that a title examiner for Sagamore noticed from the public records of Elk County that Childs was president of Elk Tanning Company, does that fact in any way affect the tax sale of June 11, 1894? Childs as president had purchased the whole warrant previous to the time that the Elk Tanning Company purchased 18 tracts of land from Proctor in the deed of October 1, 1894, included in which was Warrant 5343. The tax deed was assigned to Elk Tanning Company. Childs as president owed a fiduciary duty to his corporation and according to the best evidence in the public records of Elk County, he performed it. There is nothing to indicate that Childs owed any duty to Proctor. There is no record in Elk County of any agreement between Elk Tanning Company and Childs and Proctor. What has been said applies with equal force to the conveyance by Elk Tanning Company to the Central Pennsylvania Lumber Company, Excerpt 9. Plaintiffs say that the present defendants are estopped from asserting any claim to the gas by reason of the deed of May 25, 1903, Excerpt 9, from the Elk Tanning Company to Central Pennsylvania Lumber Company, because the deed recited that it was executed and delivered "subject to the reservations and exceptions hereinafter stated."

It is noticed, however, that the grant by Elk Tanning Company is "all the right, title, interest and estate but no greater than is now held and owned by the Elk Tanning Company, of, in and to the lands hereinbefore mentioned and the timber, trees and wood thereon * * *." The deed was signed by G. W. Childs as president of Elk Tanning Company. There was no specific reference to any exception and reservation of gas made by Proctor.

To succeed by the presentation of evidence at this late date as to the relationship between the purchaser Childs and the Elk Tanning Company and Proctor, plaintiffs must overcome the effect of the statute of limitations, being the third section of the Act of April 3, 1804, P.L. 517 (4 Smith Laws 201):

"* * * And no action for recovery of said lands shall lie, unless the same be brought within five years after the sale thereof for taxes as aforesaid."

In Robb v. Bowen, 9 Pa. 71, the court said:

"In McCall v. Hornebauch, this court decided that the limitation contained in the 3rd Section of the Act of 1804, of five years, is not repealed by the Act of 1815, but is in full force * * * An argument however has been conducted on the ground, that although the reason of the court below was not a good one, yet the judgment was correct, inasmuch as the limitation did not apply to this case, actual possession not having been taken. But that is not necessary since the Act of 1824, which authorizes an action of ejectment to be brought by the owner against the purchaser at Treasurer's sale, notwithstanding he, nor any person under him or otherwise resides on the premises."

The application of the five-year statute of limitations to the situation presented in the instant case is that if Proctor had a valid exception cut off by the tax sale of 1894, contrary to an agreement with Elk Tanning Company, it being shown that the tax sale was valid, then any action for recovery of the gas lands must have been filed within the five-year period of time. Thus plaintiffs' claim based on fraud or any other equitable reason is barred.

It is my conclusion that defendants are entitled to rely upon the record title as it appears in Elk County.

In reviewing the decisions applicable to the motions, the court has not overlooked the proposition of law that plaintiffs must recover on the strength of their own title. Plaintiffs must show that they are entitled to relief in this court. In Taylor v. Taylor, supra, the

Supreme Court of Pennsylvania has heretofore flatly stated that a plaintiff must stand upon the strength of his own title. Under the pleadings and admissions on file, this court is unable to see that plaintiffs have any claim whatsoever to the natural gas.

Moreover, the tax sale of June 8, 1914, Excerpt 12, followed by the acknowledgment of the treasurer's deed in open court shown in Excerpt 13, and which in turn is followed by the three deeds, Excerpts 14, 15 and 16, must not be and are not overlooked by this court. The 1914 tax sale was based on an assessment of the whole warrant to the Central Pennsylvania Lumber Company, which was the owner of record. The purchase was made by C. H. McCauley, Jr. He did not convey to the Central Pennsylvania Lumber Company, but conveyed to Andrew Jackson Eisenhuth and his wife, Excerpt 15, on February 1, 1921. In the meantime, on December 6, 1920, Central Pennsylvania Lumber Company had conveyed the property to Andrew Jackson Eisenhuth without exception or reservation.

The following is taken from the text in Section 46 of "Tax Sale and Titles" by John Whitworth, page 61. The Section is titled, "One Holding Defective Title to Unseated Land May Purchase," under the general heading, "Tax Sales" in Chapter V. There is inserted into the text in parentheses, the case or cases which are cited in support thereof, as follows:

"It has been said, however, that 'there is nothing in reason or law to prevent a man who holds a defective title from purchasing a better at a treasurer's sale for taxes.' (Coxe v. Gibson, 27 Pa. 160) Again, it was held that where one purchases lands at tax sales, and he has any doubt as to the sufficiency of the title, he can perfect it by purchase of the land at a subsequent tax sale. (Reinboth v. Zerbe Run Improvement Co., 29 Pa. 139.) It was said of these cases that the land being unseated, there was no personal obligation on the owner for the payment of the taxes. (Powell v. Lantzy, 173 Pa. [543] 548 [34 A. 450]); (Cobb v. Barclay, 9 [Pa.] Super. [573] 576.) It is held in another case that the owner of unseated land may purchase the land at treasurer's sale the same as may be done by an entire stranger to the title; and the reason given is that the owner is not personally responsible for the payment of the taxes. (Neill v. Lacy, 110 Pa. 294 [1 A. 325])."

■ Thus if one concedes that there were some defects in the title to the natural gas acquired by the Central Pennsylvania Lumber Company in its deed from Elk Tanning Company of May 25, 1903, Excerpt 9, then under all the principles announced in the decisions of the Pennsylvania appellate courts, such a defect was cured by the tax sale of 1914 wherein the purchaser was C. H. McCauley, Jr. From the public records of Elk County, C. H. McCauley, Jr. appears as a complete stranger to the title. His tax deed was not assigned to Central Pennsylvania Lumber Company, but his conveyance was direct to the grantees of the Central Pennsylvania Lumber Company, that is, the Eisenhuths, Excerpt 15. As this court understands it, the only attack plaintiffs made against the sale of 1914 is that McCauley was the attorney and land agent for the Central Pennsylvania Lumber Company, therefore, in some way an estoppel is sought to be raised because there exists, but not of record, a declaration of trust executed by McCauley wherein any lands he purchased were to be held in behalf of his employer, the Central Pennsylvania Lumber Company. However, no title examiner from the public record could acquire such knowledge as to the relationship between McCauley and his employer. This court understands that counsel for the plaintiffs concedes that the public records control. Mr. Carroll stated to the court, "We say that one examining the title to this tract of land in Elk County

is not obliged under any circumstances to go beyond what might appear on the public records of the several offices in Elk County."

Illustrative of the position of the defendants that they are bound by what appears on the public records, as indicated by the several indices of that record, defendants cite Pennsylvania Range Boiler Co. v. City of Philadelphia, 344 Pa. 34, 23 A.2d 723. The decision supports defendants' position in this respect. One hundred twenty years ago in Woods v. Farmere, 7 Watts 382, at page 385, Chief Justice Gibson said:

" * * * By the English principles of notice a purchaser is presumed to have known nothing which lay out of the course of his title; and I see nothing in our registry acts by which he is presumed to have known any thing which lay not in it, or was not connected with it. They raise a violent presumption that he saw all that a prudent man would see; and he is consequently presumed to have examined every perfect registry which might affect him; but no presumption beyond that can be admitted to prejudice or benefit him."

By way of emphasis, the fact that from 1870 to the present the land has been assessed as unseated, with no separate assessment of any mineral rights, requires that this court distinguish between the Pennsylvania appellate court decisions which apply to tax sales on unseated land and those which apply to tax sales of seated land. As to unseated land, any contractual relationship between owners or any fiduciary relationship between owners cannot impeach the title acquired through a tax sale of the land. As to unseated land, the proceedings for the collection of taxes are in the nature of an in rem action. Certainly the five-year statute of limitations has application in this case.

Finally, the equities favor defendants. The defendants named in this case are four corporations, The Sagamore Big Game Club, The Sylvania Corporation, United Natural Gas Company and National Fuel Gas Company. The Sagamore Big Game Club is a non-profit corporation of Pennsylvania. The individual defendants are its members and are in reality the owners of the property who will receive the royalties from the lease to The Sylvania Corporation, which drilled the wells. United Natural Gas Company is purchasing the gas from the wells. National Fuel Gas Company has been dismissed from the action. The individual defendants are 18 in number.

For a period of upwards of 60 years last past none of the plaintiffs, nor anyone on their behalf, have asserted title, nor a claim to the right of possession to the natural gas and other minerals in and under said Warrant 5343, nor brought any action for recovery of the right of possession now alleged to be in them, nor caused their alleged ownership to be separately assessed for local taxation in Benezette Township, Elk County, Pennsylvania, nor paid any local taxes thereon, and did not assert any claim to said natural gas and minerals in and under said Warrant until after the drilling of the productive discovery well and the development and equipping of said Warrant by and for the defendants for the production of natural gas by the drilling of a total of eight wells thereon, the last of which was completed on September 16, 1954, and thereafter instituted this action on September 22, 1954.

In conclusion it is believed that in the whole case there is no genuine issue of any material fact to be submitted to a jury. The issues are purely legal. The public records of Elk County cannot be impeached by any facts offered in evidence. Judgment for defendants will be directed pursuant to the provisions of Rule 56.

Appendix   A

Assessment   Record

Warrant 5343, 1100 acres, Benezette Township, Elk County, Pennsylvania

| Year | Des. of Land | Owner & Warrantee | Amount |
|---|---|---|---|
| 1870 | Wt. 5343—825 acres | James Stokes | $ |
| 1870 | Wt. 5343—275 acres | Reuben Mickel | |
| 1871 | Wt. 5343—825 acres | James Stokes | |
| 1871 | Wt. 5343—275 acres | Reuben Mickel | |
| 1871 | Wt. 5343—1100 acres | Cook and Pardee | |
| 1872 | Wt. 5343—1100 acres | Cook and Pardee | 2,750.00 |
| 1873 | Wt. 5343—1100 acres | Cook and Pardee | 2,750.00 |
| 1874 to 1879 | Wt. 5343—1100 acres | Cook and Pardee | 6,600.00 |
| 1880 to 1882 | Wt. 5343—1100 acres | Cook and Pardee | 4,400.00 |
| 1883 to 1885 | Wt. 5343—1100 acres | Cook and Pardee | 4,840.00 |
| 1886 to 1888 | Wt. 5343—1100 acres | Cook and Pardee | 4,125.00 |
| 1889 to 1891 | Wt. 5343—1100 acres | Cook and Pardee | 3,960.00 |
| 1892 to 1894 | Wt. 5343—1100 acres | Cook and Pardee | 2,500.00 |
| 1895 | Wt. 5343—1100 acres | Elk Tanning Company fr. Cook and Pardee | 2,750.00 |
| 1896 | Wt. 5343—1100 acres | Elk Tanning Company | 2,750.00 |
| 1897 | Wt. 5343—1100 acres | Elk Tanning Company | 2,750.00 |
| 1898 | Wt. 5343—1100 acres | Elk Tanning Company | 1,650.00 |
| 1899 | Wt. 5343—1100 acres | Elk Tanning Company | 4,100.00 |
| 1900 | Wt. 5343—1100 acres | Elk Tanning Company | 4,100.00 |
| 1901 to 1903 | Wt. 5343—1100 acres | Elk Tanning Company | 6,012.00 |
| 1904 | Wt. 5343—1100 acres | Elk Tanning Company | 10,709.00 |
| 1905 | Wt. 5343—1100 acres | Central Pa. Lumber Co. from Elk Tanning Co. | 10,709.00 |
| 1906 | Wt. 5343—1100 acres | Central Pa. Lumber Co. from Elk Tanning Co. | 10,709.00 |
| 1907 to 1909 | Wt. 5343—1100 acres | Central Pa. Lumber Co. | 8,000.00 |

| | | | |
|---|---|---|---|
| 1910 to 1920 | Wt. 5343—1100 acres | Central Pa. Lumber Co. | 2,200.00 |
| 1921 | Wt. 5343—1100 acres | Andrew Jackson Isenhuth fr. Central Pa. Lumber Co. | 2,200.00 |
| 1922 | Wt. 5343—1100 acres | Andrew Jackson Isenhuth fr. Central Pa. Lumber Co. | 3,300.00 |
| 1923 | Wt. 5343—1100 acres | Andrew Jackson Isenhuth fr. Central Pa. Lumber Co. | 3,300.00 |
| 1924 to 1954 | Wt. 5343—1100 acres | Sagamore Big Game Club | 3,300.00 |

## Appendix B

Excerpts from abstract of title to 1100 acres, Warrant 5343, Benezette Township, Elk County, Pennsylvaia.

### (Excerpt No. 1)
#### Deed

Ario Pardee, Jr.; Calvin Pardee and Mary E., his wife; Alice P. Earle and James M., her husband; Barton Pardee; Anne P. Allison and L. S. Allison, her husband; Frank Pardee and Kate S., his wife; Bessie P. VanWickle and Augustus S. VanWickle, her husband; Edith Pardee; Gertrude Pardee; Israel P. Pardee and Alice Lee, his wife; being all of the heirs at law of Ario Pardee, Late of Luzerne County,

TO

W. D. Bigler, A. R. Powell and W. C. Cardon.

: Dated March 20, 1893

: Acknowledged March 28, 1893

: Recorded May 2, 1893, in Deed Book 40, at Page 137

: General Warranty

: Consideration—$2333.33 paid in his lifetime to Ario Pardee under agreement dated June 9, 1890, for sale of premises and $1341.21 paid to Calvin Pardee, Administrator of Estate of Ario Pardee.

Conveys Warrant 5343—1100 acres.
Recites Pardee died March 26, 1892, intestate.
No exceptions or reservations.

(Excerpt No. 2)

Deed

| | |
|---|---|
| William D. Bigler and Alice, his wife; A. R. Powell and Annie, his wife; W. C. Cardon and Lidy, his wife, | ) Dated June 5, 1893 |
| | ) |
| | ) Acknowledged June 5, 1893 |
| | ) |
| TO | ) Recorded June 16, 1893, in Deed |
| | ) Book 40, at page 204. |
| Thomas E. Proctor | ) |
| | ) Consideration—$7500.00 |
| | ) |
| | ) Grant and Convey |
| | ) |
| | ) Special Warranty |

Conveys Warrant 5343—1100 acres.
No exceptions or reservations.

(Excerpt No. 3)

Assessment and Sale for Non Payment of Taxes

Copy of Entry in Unseated Land book "D"
Pages 522–523 (Treasurer's Office Record)

| Warrant | No. of Acres | Warrantee & Owners | Taxes |
|---|---|---|---|
| 5343 | 1100 | Cook and Pardee | 1892–1893 |

Following the above listing under remarks is the following entry:

"Sold Wt. 5343—1100 as. for taxes and costs of 1892 to George W. Childs, June 11, 1894."

"Paid in full for 1893 upon Wt. 5343—1100 as. by Elk Tanning Company, December 30, 1893. Int. $8.70."

(Excerpt No. 4)

Treasurer's Sale of Unseated Land

Treasurer's Sale Book 2, at Page 396
Sales year—1894
Sold for taxes 1892

| Warrant | No. of Acres | Reputed Owner | Date Sold |
|---|---|---|---|
| 5343 | 1100 | Cook and Pardee | June 11, 1894 |

| Purchaser | Taxes & Costs |
|---|---|
| George W. Childs | $113.70 |

NOTE: There is no redemption shown on the Treasurer's Sale Book under this entry.

The Redemption Book in the Treasurer's Office shows no redemption between the dates of June 11, 1894 to December 30, 1901 (Pages 69–77).

(Excerpt No. 5)

Treasurer's Deed

| | |
|---|---|
| T. J. Shaffer<br>Treasurer of Elk County,<br><br>to<br><br>George W. Childs. | : Dated June 11, 1894<br>:<br>: Acknowledged in Open Court July 3,<br>: 1894<br>.:<br>: Recorded June 30, 1898, in Deed Book<br>: "W," at Page 468 |

Treasurer's Sale of unseated land.

Date of Sale—June 11, 1894.

Sold for taxes of year 1892.

Conveys Warrant 5343, containing 1100 acres,
    assessed in the name of Cook and Pardee.

Sale Price—$113.70.

Notation on margin of Deed record:

---

"Assignment of this deed to Elk Tanning Company
recorded in this book at page 480."

(Excerpt No. 6)

Acknowledgment of Treasurer's Deed

Acknowledgment by T. J. Shaffer, Treasurer of Elk County before Court of Common Pleas on July 3, 1894, of Treasurer's Deed to George W. Childs, Item ———, is entered in Treasurer's Acknowledgment Book "B," Pages 216, 217.

This acknowledgment is entered as follows:

Acknowledgment of Treasurer's Sale for taxes 1892—1893 (Sales year 1894).

| Warrant | No. of Acres | Warrantee | Supposed Owner |
|---|---|---|---|
| 5343 | 1100 | ---- | Cook and Pardee |

| Township | Purchaser | Date of Sale | Taxes & Costs |
|---|---|---|---|
| Benezette | George W. Childs | June 11, 1894 | $ 113.70 |

| Bond | Bid |
|---|---|
| ---- | $ 113.70 |

(Excerpt No. 7)

Deed

| | |
|---|---|
| Thomas E. Proctor and | : Dated October 1, 1894 |
| Enura H. Proctor, | I: |
| | : Acknowledged October 23, 1894 Grant, |
| to | ·: bargain, sell, release and confirm |
| | I: Recorded January 22, 1895, in Deed |
| ·Elk Tanning Company | I: Book 43, at Page 252 |
| | i: General Warranty |
| | : Consideration—$1.00 and divers other |
| | : good and valuable consideration |

Conveys, inter alia :—

Number two :— All that certain piece, parcel or tract of land situate, lying and being in the Township of Benezette in the County of Elk and State of Pennsylvania, and originally surveyed upon Warrant number 5343 and bounded as follows :— On the North by tract numbered 5342 on the East by tract numbered 5388 on the South by tract numbered 5344 and on the West by tract numbered 5340. Containing 1100 acres and allowance. Being the same tract of land conveyed to the said Thomas E. Proctor in fee simple, by William D. Bigler and Alice, his wife, A. R. Powell and Annie, his wife, and W. C. Cardon, and Lidy, his wife, by their deed, duly executed and acknowledged bearing date the 5th day of June, A.D. 1893, and duly recorded in the Office of the Recorder of Deeds in and for the County of Elk aforesaid, in Deed Book No. 40, pages 204 &c.

Excepting and Reserving nevertheless, to the said Thomas E. Proctor his heirs and assigns, all the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character, in, upon or under the said lands, hereinbefore mentioned and described, and hereby conveyed, and every part thereof, or which may at any time hereinafter be discovered in, upon, or under said lands or any part thereof, with the right to enter said lands for purposes of exploration and taking away the said natural gas, coal, oil, petroleum, or other minerals hereby reserved, and to erect such structures, ways, buildings, railroads, and shafts thereon, both up and down, to cut and fill the surface wherever needed for railways for such purposes, and to dig channels and ditches for waste water thereon, and to do these and such other things thereon in such manner as may be necessary, to successfully mine and take away the said natural gas, coal, coal oil, petroleum, marble and other minerals or any of them from the said lands aforesaid.

With the right to the said Thomas E. Proctor, his heirs and assigns to use such timber as may be necessary for the purposes of mining or taking away the natural gas, coal, coal oil, petroleum, marble and other minerals as above reserved. The said Thomas E. Proctor, his heirs or assigns, to pay for the timber so used as aforesaid, to the said party of the first part hereto, their successors or assigns, the value of any such timber, so taken for the purposes aforesaid, as standing timber at the time the same is taken and used as aforesaid.

Together with all and singular the buildings, improvements, ways, streets, alleys, passages, waters, watercourses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging or in anywise appertaining.

And the reversions and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claim and demand whatsoever of them the said party of the first part, as well at law as in equity of, in and to the same excepting and reserving always nevertheless therefrom as is hereinbefore mentioned and contained.

To Have and To Hold, the said several hereinbefore mentioned and described tracts, pieces or parcels of land, timber and hemlock bark, hereditaments and premises hereby granted or mentioned and intended so to be with the appurtenances, also the timber and hemlock bark, as hereinbefore mentioned unto the said Elk Tanning Company, party of the second part, its successors and assigns. To and for the only proper use and behoof of the said Elk Tanning Company, party of the second part, its successors and assigns forever. Excepting and Reserving, always nevertheless from this grant as is hereinbefore excepted and reserved, and subject to all the conditions as is hereinbefore mentioned and contained.

(Excerpt No. 8)

Assignment of Treasurer's Deed

G. W. Childs and Florence M. Childs,

to

Elk Tanning Company

: Dated June 28, 1898
:
: Acknowledged June 29, 1898
:
: Recorded June 30, 1898, in Deed Book
: "W," at Page 480
:
: Consideration $1.00

Assigns all right, title and interest of the Grantors in the Treasurer's Deed abstracted to Item ———.

(Excerpt No. 9)

Deed

Elk Tanning Company

to

Central Pennsylvania Lumber Company

: Dated May 25, 1903
:
: Acknowledged May 25, 1903
:
: Recorded June 8, 1903, in Deed
: Book 55, at page 381
: Grant, bargain and convey
: General Warranty.

Conveys inter alia Warrant 5343, containing 1100 acres.

Third: Warrants and parts of Warrants Number 4890, 326 acres 4901, 995 acres; 4896, 762 acres; all situate in Fox Township and 5343, 1100 acres situate in Benezette Township, Containing together 3183 acres, and being the same land conveyed by Thomas E. Proctor and wife to the Elk Tanning Company and more particularly mentioned and described in deed dated October 1, 1894, and recorded in Elk County in Deed Book No. 43, page 252 on January 2, 1895.

Reserving and Excepting Nevertheless unto the party of the first part, its successors and assigns, all the hemlock bark, rock oak bark and chestnut oak bark upon said lands timber and trees with the rights of ingress, egress and regress for the purpose of cutting, peeling, curing, piling, storing and removing said bark in the usual and ordinary manner at any and all times within the period of twenty-five (25) years from the date hereof; and with the right to erect and maintain camps, barns, and other buildings upon said lands for such bark purposes and to construct and maintain roads, tram-roads and railroads through over and across the same, for the purpose of hauling, shipping and transporting bark and other freights and supplies, from and to said

lands or any other lands, and with the further full and free right to cut, take and use such trees and timber, without liabilities therefor, as may be necessary and proper for the erection and maintenance of such camps, barns and buildings and the construction and maintenance of said roads, tram-roads and railroads, and with the right and privilege of taking and removing any and all of said property and improvements at any and all times during the aforesaid term of twenty-five (25) years.

It is Further Understood and Agreed by and between the parties hereto, that the party of the first part, its successors and assigns, by reason of its ownership in the bark and bark rights, herein reserved, hereby covenants and agrees to pay the one third part of any and all lawful taxes which may be assessed and levied against any of said tracts of land upon which there is hemlock bark, chestnut oak bark, or rock oak bark, until said bark is removed therefrom, and written notice given to the party of the second part, its successors or assigns of such removal and that possession of such tract of land for bark purposes is surrendered, when all liability of the party of the first part, its successors or assigns, for the payment of taxes (Sic) thereon shall cease and terminate.

And the party of the second part for itself and its successors and assigns, hereby covenants and agrees to pay all remaining taxes upon said lands, timber and bark during the joint possession thereof, including all taxes that may be levied and assessed upon any increased valuation by reason of improvements, or developments made on said lands. This deed is made, executed, delivered and accepted for the purpose of vesting in the party of the second part, its successors and assigns, all the right, title, interest and estate but no greater than is now held and owned by the Elk Tanning Company, of, in and to the land hereinbefore mentioned, and the timber, trees, and wood thereon, Subject to all the exceptions, reservations, covenants, stipulations, agreements and conditions contained in the several deeds hereinbefore recited, and subject Also to all the exceptions, reservations, covenants, stipulations, agreements and conditions hereinbefore stated.

Together with all and singular, the tenements, hereditaments and appurtenances to the same belonging or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, And also all the estate right, title, interest, property, claim and demand whatsoever, both in law and equity of the said party of the first part, of, in, to or out of the said premises and every part and parcel thereof.

To Have and to Hold the said premises, with all and singular the appurtenances, unto the said party of the second part, its successors and assigns, to and for the only proper use and behoof of the said party of the second part, its successors and assigns forever. Subject to the exceptions and reservations hereinbefore mentioned.

(Excerpt No. 10)

Assessment and Sale for Non Payment of Taxes

Copy of Entry In Unseated Land Book "G,"
Page 117 (Treasurer's Office Record).

| Warrant | No. of Acres | Warrantee and Owner | Taxes | Amount Bid |
|---------|--------------|---------------------|-------|------------|
| 5343 | 1100 | Central Pennsylvania Lumber Company | 1912–1913 | $ 171.60 |

Following the above listing under remarks is the following entry:
"Sold Wt. 5343—1100 as. to C. H. M'Cauley, Jr.
June 8, 1914 for taxes and costs. Int. 9.67."

(Excerpt No. 11)

Treasurer's Sale of Unseated Lands

Treasurer's Sale Book 3, Page 90
Sales Year—1914
Sold for taxes 1912 and 1913

| Warrant | No. of Acres | Reputed Owner | Date of Sale |
|---------|--------------|---------------|--------------|
| 5343 | 1100 | Central Pennsylvania Lumber Company | June 8, 1914 |

| Purchaser | Taxes & Costs |
|-----------|---------------|
| C. H. M'Cauley, Jr. | $ 186.27 |

Note:— No redemption from this sale is shown under this entry in the Treasurer's Sale Book

No redemption is shown on the Redemption Book in the Treasurer's Office between the dates of June 8, 1914 and June 8, 1920 (pages 95–99)

(Excerpt No. 12)

Treasurer's Deed

William Simons
Treasurer of Elk County
  to
C. H. McCauley, Jr.

Dated—June 8, 1914
Acknowledged in open court July 6, 1914
Recorded—October 9, 1957 in Deed
Book 138 page 99
Bid $186.27

Treasurer's Sale of Unseated Land
Date of Sale—June 8, 1914
Sold for taxes of years 1912 and 1913
Conveys Warrant #5343 containing 1100 acres
  assessed in name of Central Penna. Lumber Co.
Sale Price—$186.27

(Excerpt No. 13)

Acknowledgment of Treasurer's Deed

  Acknowledgment by William Simons, Treasurer of Elk County before Court of Common Pleas on July 6, 1914, of Treasurer's Deed to C. H. McCauley, Jr., Item None, is entered in Treasurer's Acknowledgment Book "B," pages 290–291.

  This acknowledgment is entered as follows:—

Acknowledgment of Treasurer's Deeds for Taxes of 1912–1913—Sales Year 1914.

| Warrant | No. of Acres | Supposed Owner | Township |
|---------|--------------|----------------|----------|
| 5343 | 1100 | Central Pennsylvania Lumber Company | Benezette |

| Purchaser | Date of Sale | Taxes & Costs | Bond |
|-----------|--------------|---------------|------|
| C. H. McCauley, Jr. | June 8, 1914 | $ 186.27 | ---- |

Bid
$ 186.27

(Excerpt No. 14)

Deed

Central Pennsylvania Lumber Company : Dated December 6, 1920

to : Acknowledged December 23, 1920

Andrew Jackson Eisenhuth : Recorded February 15, 1921, in Deed Book 80, at Page 451

: Consideration—$3300.00
:     Special Warranty

Conveys Warrant 5343—1100 acres        (Wt. 5343 is only tract
No exceptions or reservations           conveyed by this deed.)

(Excerpt No. 15)

Deed

Calvin H. M'Cauley, Jr., and Florence M. M'Cauley, : Dated February 1, 1921

to : Acknowledged February 1, 1921

Andrew Jackson Eisenhuth and Minnie Eisenhuth, his wife : Recorded March 6, 1925, in Deed Book 85, at Page 518

: Quit-claim

(Excerpt No. 16)

Deed

Andrew Jackson Eisenhuth and Minnie Eisenhuth, his wife, : Dated June 8, 1921

to : Acknowledged June 30, 1921

The Sagamore·Big Game Club : Recorded Sept. 29, 1921, in Deed Book 81, at page 217
: General Warranty

Conveys same 1100 acres in Warrant No. 5343 as described in Deed recorded in Deed Book 80, page 451, and recites the same.

(Excerpt No. 17)

Oil and Gas Lease

The Sagamore Big Game Club : Dated August 31, 1933

to : Recorded in Miscellaneous Book "M," at page 91

R. W. Howard and Belle L. Howard : Term, 20 years, etc.

Leases 1100 acres comprising Warrant 5343 in Benezette Township for oil and gas purposes.

No operations were carried on under this lease and it was rendered of no force and effect for non performance of the terms and provisions on the part of the lessees.

(Excerpt No. 18)

Oil and Gas Lease

Sagamore Big Game Club           :  Dated May 31, 1940
:
to                            :  Acknowledged May 31, 1940
:
The Sylvania Corporation        :  Recorded June 7, 1940, in Misc.
:    Book No. "M," page 396
:
:  Term, 10 years, etc.

Leases for oil and gas purposes land in Benezette Township, bounded and described as follows:

North by lands of Warrant No. 5342
East by lands of Warrant No. 5388
South by lands of Warrant No. 5344
West by lands of Warrant No. 5340

(Excerpt No. 19)

Oil and Gas Lease

Sagamore Big Game Club           :  Dated May 31, 1950
:
to                            .:  Acknowledged June 9, 1950
:
The Sylvania Corporation        :  Recorded August 12, 1950, in Misc.
:    Book "O," page 40
:
:  Term, to June 15, 1955, etc.

Leases for oil and gas purposes land in Benezette Township, bounded and described as set out in item 18.